## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

MARY DURGIN, as Administrator of the )
Estate of RICHARD DURGIN, deceased, )
)
    Plaintiff, )
)
v. )    Civil Action No. 3: 14CV700
)
THE UNITED STATES OF AMERICA, )
)
    Serve: )
    United States Attorney's Office )
    Eastern District of Virginia )
    600 East Main Street )
    Suite 1800 )
    Richmond, VA 23219-2447 )
)
    And )
)
    Serve: )
    U.S. Attorney General )
    U.S. Department of Justice )
    950 Pennsylvania Avenue, NW )
    Washington, DC 20530 )
)
    Defendant. )
)

## COMPLAINT

COMES NOW the Plaintiff, MARY DURGIN, as Administrator of the Estate of RICHARD DURGIN, deceased, brings this action to obtain relief from the Defendant UNITED STATES OF AMERICA and alleges the following:

### THE PARTIES

1.    The decedent, RICHARD DURGIN, was a veteran of the United States military and was eligible for medical benefits, including receiving medical treatment and care at U.S. Department of Veterans Affairs hospitals, including Hunter Holmes McGuire VA Medical Center.

2.     Plaintiff, MARY DURGIN is the spouse of RICHARD DURGIN, and brings this suit in her capacity as Administrator of the Estate of RICHARD DURGIN, and in her personal and representative capacities. MARY DURGIN was appointed Administrator of the Estate of RICHARD DURGIN on January 15, 2013, in the State of North Carolina by the Superior Court Division in Surry County. (See attached Exhibit "A"). The Circuit Court in The City of Richmond, Virginia subsequently domesticated this appointment and made Mrs. Durgin Administrator on June 9, 2014. (See attached Exhibit "B").

3.     Plaintiff, MARY DURGIN, as Administrator of the Estate of Richard Durgin also brings this action on behalf of the beneficiaries of RICHARD DURGIN's estate.

4.     At all times material hereto, Defendant, The United States of America (hereinafter referred to as "Defendant"), was the employer of certain healthcare providers, including, but not limited to staff physicians, resident physicians, nursing personnel, nursing assistants and others who administered treatment to RICHARD DURGIN while he was a patient at Hunter Holmes McGuire VA Medical Center in Richmond, Virginia from May 23, 2011 through June 22, 2011.

## JURISDICTION AND VENUE

5.     The claims herein are brought against The United States of America pursuant to the Federal Tort Claims Act, 28 U.S.C. §2671, *et seq.* and 28 U.S.C. §§1346(b)(1), for money damages as compensation for personal injuries that were caused by the negligent and wrongful acts and omissions of agents and employees of The United States of America while acting within the scope of their offices and employment, and pursuant to 28 U.S.C. §2674, under circumstances where the Defendant, United States of America, would be liable "...in the same manner and to the same extent as a private individual under like circumstances".

6.      Hunter Holmes McGuire VA Medical Center and the Department of Veterans Affairs, are agencies of The United States of America, and as such, sovereign immunity has been waived pursuant to the Federal Tort Claims Act, 28 U.S.C.A. §§ 2671 to 2680.

7.      All incidents giving rise to this claim occurred in the City of Richmond, in the Commonwealth of Virginia, thereby giving rise to this Court's jurisdiction over these matters.

8.      Venue is proper in that all, or a substantial part of the acts and omissions forming the basis of these claims occurred in the Eastern District of Virginia.


## TIMELY FILED NOTICE AND COMPLAINT

9.      Plaintiff has fully complied with the provisions of 28 U.S.C. §2675 of the Federal Tort Claims Act and all conditions precedent required of the Plaintiff prior to bringing this action have occurred or have been met, including all statutory pre-suit notice and investigation requirements of the Federal Tort Claims Act including 28 U.S.C.A. §2401 and 28 U.S.C.A §2675.

10.     An administrative tort claim was presented to the Department of Veterans Affairs on or about April 12, 2013 alleging medical malpractice (see attached Exhibit "C"). On June 21, 2013, the Department of Veterans Affairs denied the administrative tort claim (see attached Exhibit "D"). Pursuant to  28 C.F.R. §14.9 (b), a request for reconsideration was sent to the Department of Veterans Affairs on December 6, 2013 (see attached Exhibit "E").

11.     To date, Plaintiff has not received a response to the December 6, 2013 request for reconsideration of Plaintiff's administrative tort claim. Pursuant to 28 U.S.C. § 2675(a), the Department of Veterans Affairs' failure to respond within six (6) months (on or before June 6,

2014) of Plaintiff's request for reconsideration of Plaintiff's administrative tort claim is deemed a final denial of this administrative tort claim as of June 6, 2014.

12.    Pursuant to 28 C.F.R. §14.9 and 28 U.S.C. §2401(b), the deadline for Plaintiff to file suit in this matter expires on or about December 6, 2014. Therefore, Plaintiff timely files this suit within six (6) months after the Department of Veterans Affairs' final denial of the request for reconsideration of Plaintiff's administrative tort claim.

## FACTS GIVING RISE TO THE CAUSE OF ACTION

13.    At the time of the incident complained of herein, Richard Durgin was a 78 year old, married, United States Veteran, with five children.

14.    On or about May 23, 2011, RICHARD DURGIN presented to the Hunter Holmes McGuire VA Medical Center Emergency Room with complaints of chest pain and tightness.

15.    Upon admission to Hunter Holmes McGuire VA Medical Center, RICHARD DURGIN had no pressure ulcers or skin breakdown.

16.    Despite being admitted without pressure ulcers or skin breakdown, during the course of MR. DURGIN'S thirty (30) day admission at Hunter Holmes McGuire VA Medical Center from May 23, 2011 through June 22, 2011, he developed multiple pressure ulcers which were both foreseeable and preventable, and as explained below, which the Defendant's staff failed to appropriately care plan, assess, and treat, resulting in not only the development of pressure ulcers but also the worsening of these pressure ulcers.

17.    The references below are not intended to be an exhaustive list of every such entry. Furthermore, the facts outlined below do not reflect every act, error, or omission that was, or may have been committed by the Defendant. Plaintiff reserves the right to contend and prove

additional acts, errors, and omissions as revealed in discovery on the part of the Defendant that reflect a departure from the requisite standard of care as required by law.

18.     Upon admission to Hunter Holmes McGuire VA Medical Center on May 23, 2011, a Nursing Initial Skin Assessment was performed and it stated that Mr. Durgin had "[n]o wounds, pressure ulcers or other skin problems". This note further stated (in the section for interventions) that "[t]he pressure ulcer prevention protocol was not needed – patient is not at risk."

19.     According to the Nursing Progress Notes, on May 24, 2011 at 0700 hrs (7:00 a.m.), physical restraint was initiated on Mr. Durgin. Based on the information available to Plaintiff at this time, no description was provided as to where on Mr. Durgin's body these restraints were placed. In addition to the above-referenced physical restraints, the addendum to the Cardiology Resident note on May 24, 2011 at 0819 hrs (8:19 a.m.) stated, "Mr. Durgin has developed AMS as described by Dr. Carden. We suspect this is ICU psychosis....I agree that haldol is a good choice to keep him calm."

20.     These entries by the Defendant's staff show that Defendant used both chemical restraint and physical restraints on Mr. Durgin. Use of both or either type of restraint would have prevented Mr. Durgin from turning and repositioning himself, and thus increased Mr. Durgin's risk for developing pressure ulcers.

21.     Despite the changes in Mr. Durgin's condition, and the use of chemical and physical restraints, there were no adjustments to Mr. Durgin's care plan and there were no interventions implemented by the Defendant's nurses and staff to prevent Mr. Durgin from developing pressure ulcers.

22.     Approximately 13 hours later, on May 24, 2011 at 20:17:03 hrs (8:17 p.m.), it was noted that Mr. Durgin "met criteria for removal of restraints: decreased agitation".

23.     The Nursing Skin Assessment that was conducted on May 24, 2011 at 20:00 hrs (8:00 p.m.) reported that Mr. Durgin's Braden Scale Score was now 17 which placed him at "mild risk" for developing pressure ulcers.  Despite the increase in Mr. Durgin's risk for developing pressure ulcers, the May 25, 2011 Nursing Care Plan did not include any interventions to prevent Mr. Durgin from developing pressure ulcers.

24.     The Defendant's continued neglect of Mr. Durgin's increasing risk for developing pressure ulcers and need for proactive interventions to prevent Mr. Durgin from developing pressure ulcers was confirmed in the Nursing Care Plan on May 26, 2011 at 0324 hrs which stated, "Nursing care plan from 5/25/11 reviewed.  No changes necessary."

25.     The Defendant's neglect of Mr. Durgin continued throughout Mr. Durgin's admission at Hunter Holmes McGuire VA Medical Center, as the Defendant's physicians, nurses and staff utilized various forms of restraint which further immobilized Mr. Durgin and continuously increased his risk for developing pressure ulcers.  However, as demonstrated below, the Defendant's physicians, nurses, and staff failed to implement necessary interventions to prevent Mr. Durgin from developing pressure ulcers, such as the use of a pressure reducing mattress, turning and repositioning, or the use of other protective devices to relieve pressure points, to prevent the development of pressure ulcers, or to treat the hospital acquired pressure ulcers.

26.     For instance, the May 25, 2011 Nursing Progress Notes at 05:58 hrs (5:58 a.m.) reported that Mr. Durgin's skin showed "No wounds, pressure ulcers or other skin problems." The interventions reported at that time were to use a "Pressure-Redistribution Measures, use

6

specialty bed, type: stryker; encourage small, frequent position changes, encourage activity as tolerated; maintain clean and dry skin."

27.     As Mr. Durgin began to develop pressure ulcers, there were several entries in the Nursing Skin Assessment Notes and Nursing Progress Notes that the Defendant's nurses and staff would use a stryker bed (a specialty bed which may be used for pressure-redistribution) as an intervention to prevent and treat Mr. Durgin's pressure ulcers. Some of these entries were on 5/25/11, 6/3/11, 6/9/11, 6/8/11, 6/6/11, and 6/5/11.

28.     However, as evidence of the Defendant's negligence, despite Mr. Durgin's high risk for pressure ulcers and the Defendant's alleged plans to order the stryker bed, the Defendant's nurses and staff failed to timely provide and negligently delayed ordering Mr. Durgin's stryker bed for approximately twenty-two (22) days from the date when the Defendant's nurses and staff recognized that Mr. Durgin's pressure ulcer risk was increasing and needed a stryker bed. This is confirmed by the Wound Care Consult notes by Curlene Clarke, CWOCN, on June 16, 2011 at 1731 hrs (5:31 p.m.) where she stated, "Noted that he [Mr. Durgin] was lying on standard hospital mattress. I have ordered a DFS-3 mattress for him for delivery this evening."

29.     As a result of the Defendant's significant delays in implementing necessary interventions to prevent Mr. Durgin from developing pressure ulcers, and to prevent the worsening of any hospital acquired pressure ulcers, the Wound Care Note by Curlene Clarke, CWOCN on June 17, 2011 reported that since Mr. Durgin's admission, within 25 days of being at the Defendant's hospital, Mr. Durgin developed the following pressure ulcers:

> O:  Specialty mattress in place.  Skin intact except as noted below:
> - 1cm eschar on occiput
> - Sacrum 3cm x 1.5cm 100% soft yellow slough. Surrounding tissue w/ 1cm redness. Minimal yellow drainage. No odor.
> - Posterior, distal LLL: 7cm x 5cm dry adherent slough
> - Posterior, distal RLL: 9cm x 5cm, dry adherent slough

- Posterior L heel: 2 x 3cm dry eschar and resolving DTI
- Posterior R heel: 4.5cm x 7cm dry eschar and resolving DTI
- Dorsal R 2nd toe – blanchable redness DIP and PIP.

A:  Multiple unstageable pressure wounds. DTI

P:  Wound care daily...For heels...offload w/ sage prevalon boots.  For occiput-keep off back....Turn every 2h even w/DFS mattress.

30.     Mr. Durgin was at an even greater risk for developing pressure ulcers because of the Defendant's nursing staff's extensive use of physical restraints which prevented Mr. Durgin from attempting to turn and reposition himself.  For example, on May 30, 2011, the Restraint Progress Note stated, "Restraint initiated (date/time): May 30, 2011 @ 23:55" (11:55 p.m.).  The type and location of restraint utilized were "More restrictive: *Wrist x2; Ankle x1; Sr up x4*." Emphasis added.

31.     The May 31, 2011 addendum to the Restraint Progress Note stated "no changes to restraint orders and interventions."

32.     Plaintiff specifically refers to one example to illustrate the extent of the Defendant's nursing staff's negligent treatment of Mr. Durgin. The Nursing Skin Assessment that was conducted on May 31, 2011 at 02:13 (2:13 a.m.) by Kathleen M. Bunch, R.N. stated that Mr. Durgin's score on the Braden Scale for predicting pressure sore risk was now 14, placing him at a moderate risk.

33.     During this skin assessment, it was noted that Mr. Durgin had a "Stage II [pressure ulcer] to posterior ankles – blistered."   The noted interventions were to: (1) Teach patient/caregiver importance of changing position frequently for pressure ulcer prevention; (2) Use specialty bed, specify type: stryker; (3) Turn and reposition every 2 hours while in bed, using pillows to separate pressure areas; (4) Apply heel/elbow pads; (5) Perform range of motion exercises when turning / repositioning; (6) Maintain clean and dry skin; (7) Apply protective

barrier ointment; (8) Tube feeding as ordered; (9) Reduce Friction and Shear: Use a bed trapeze or pull sheet to lift up in bed or turn."

34.     As mentioned above, the stryker bed was not ordered for Mr. Durgin until June 16, 2011 (see¶ 27 above).  In addition, the Defendant's nursing staff negligently failed to consider the fact that Mr. Durgin's restraint on his wrists and ankles (see ¶ 29 above) made it very difficult, if not impossible, for Mr. Durgin to attempt to change his position.  It was therefore meaningless to suggest that one of the interventions was to "Teach patient...[the] importance of changing position frequently for pressure ulcer prevention" when Mr. Durgin's ankles and wrists were restrained.

35.     The Nursing Re-Assessment that was performed at 09:29 hrs (9:29 a.m.) on May 31, 2011 reported that Mr. Durgin needed an Ostomy/Wound Care consultation.

36.     Four hours later, on May 31, 2011 at 13:24 hrs (1:24 p.m.) a Skin Assessment addendum was prepared by Linda Sweeney, R.N. which noted additional pressure ulcers on Mr. Durgin's "...bilateral posterior ankles. Right lower extremity with Stage II....Left lower extremity with blister...~2cm pressure sore at gluteal folds, pt repositioned and off loaded with pillows, turning q2hours. Remaining skin intact except for invasive lines."

37.     The Nursing Notes confirmed Mr. Durgin's risk for developing pressure ulcers continuously increased as reflected by his Braden Scores. See ¶¶ 22 and 31 above. By June 1, 2011 at 06:38 hrs Mr. Durgin's Braden Score was 12, placing him at high risk for developing pressure ulcers.

38.     By denying Mr. Durgin the necessary interventions, and in deviation from the standard of care, the Defendant, by its actions and inactions, placed Mr. Durgin's health and well-being at even greater risk and caused Mr. Durgin to develop pressure ulcers as well as the

worsening of pressure ulcers that he acquired during his thirty (30) day admission at Hunter Holmes McGuire VA Medical Center.

39.     As a result, by June 1, 2011 at 06:38 hrs (6:38 a.m.) the pressure ulcer assessment showed that Mr. Durgin's skin breakdown as reported above (see ¶¶ 32 and 35 above) had in fact worsened, and were now a "Stage I gluteal fold, Stage I Left posterior ankle, Stage II Right posterior ankle." Still, the noted interventions, despite the worsening of his pressure ulcers and the continued use of restraints on Mr. Durgin's wrists, ankle and "SR up x4", were to (1) Teach patient/caregiver importance of changing position frequently for pressure ulcer prevention; (2) Use specialty bed, specify type: stryker; (3) Turn and reposition every 2 hours while in bed, using pillows to separate pressure areas; (4) Elevate heels using pillow or foam blocks; (5) Apply heel/elbow pads; (6) Perform range of motion exercises when turning / repositioning; (7) Maintain clean and dry skin; (8) Apply protective barrier ointment; (9) Manage Nutrition: NPO; (10) Reduce Friction and Shear: Use a bed trapeze or pull sheet to lift up in bed or turn."

40.     The actions and/or inactions by the Defendant's nurses and staff, as illustrated above, were within the scope of these individuals' offices and employment with the Defendant.

41.     As a result of the Defendant's nurses and staff's actions and/or inaction, such as: (1) the extensive use of physical restraint; (2) the use of chemical restraint; (3) the failure and/or delay in implementing necessary interventions to prevent Mr. Durgin's development of pressure ulcers such as ordering the stryker bed; and (4) the failure to reassess Mr. Durgin's Care Plan, his need for intervention, and the failure to reassess the types of intervention being utilized, Mr. Durgin's hospital-acquired pressure ulcers worsened within two (2) weeks of his admission to Hunter Holmes McGuire VA Medical Center.

42.    By June 5, 2011, Kathleen M. Bunch noted that Mr. Durgin had acquired a deep tissue injury to his bilateral heels, gluteal fold and a stage II ulcer to the bilateral posterior ankles.

43.    Twenty one (21) days after his admission, on June 13, 2011, Mr. Durgin had stage II ulcers to the sacrum, the right and left medial malleolus, and the right and left heels as noted by Nurse Jason Edward Flores Marcelino.

44.    By June 17, 2011, (24 days after admission), Nurse Clarke conducted another skin assessment and noted that Mr. Durgin's pressure ulcers had worsened and he now had a 1cm eschar on occiput; 3x1.5cm sacrum ulcer with 100% soft yellow slough, RLL distal posterior, 7x5cm; LLL distal posterior, 9x5cm; left heel 2x3cm; right heel 4.5x7cm; and dorsal right second toe has blanchable redness of the DIP and PIP joints.

45.    The development and worsening of all of these pressure ulcers during Mr. Durgin's admission at Hunter Holmes McGuire VA Medical Center caused him severe pain, suffering, disfigurement, and contributed to his death on October 18, 2011.

## DEFENDANT'S DUTIES AND THE STANDARD OF CARE

46.    At all times material hereto, the patient, RICHARD DURGIN, was under the continuous medical care and treatment of the doctors, nurses, and staff at Hunter Holmes McGuire VA Medical Center in Richmond, Virginia.

47.    The United States of America by and through its agency (Hunter Holmes McGuire VA Medical Center), employees, servants, agents and or apparent agents, including but not limited to nursing and physician personnel, owed RICHARD DURGIN a duty of care to act within the prevailing professional standards of care for nurses and physicians in their care and

treatment of RICHARD DURGIN during his admission to the Hunter Holmes McGuire VA Medical Center in Richmond, Virginia from May 23, 2011 through his discharge on June 22, 2011.

48.    By accepting MR. DURGIN as a patient in its hospital, the Defendant, through its agents, employees and staff at Hunter Holmes McGuire VA Medical Center undertook a duty to provide adequate care and treatment for all of Mr. Durgin's medical and other personal needs.

49.    The employees, staff, nurses, and other related medical personnel at Hunter Holmes McGuire VA Medical Center failed to adequately treat, observe and otherwise provide medical care for RICHARD DURGIN in accordance with the prevailing professional standards of care for similar health care providers within the same or a similar medical community.

50.    The employees, staff, nurses, and other related medical personnel at Hunter Holmes McGuire VA Medical Center failed to assure proper patient care when they knew or should have known that RICHARD DURGIN needed medical intervention.

51.    The Defendant undertook the duty to treat the decedent, RICHARD DURGIN, between May 23, 2011 and June 22, 2011, in accordance with the prevailing professional standards of care. Notwithstanding the duties undertaken, during the course of providing health care to the decedent, RICHARD DURGIN, said agents and / or employees of the United States of America, breached the duties owed to the decedent and were negligent.

52.    The Defendant's responsibilities to RICHARD DURGIN are mandated under Federal and Virginia law, and such responsibilities are nondelegable.

53.    The Defendant has direct and vicarious liability for the conduct, actions, inactions, errors, or omissions committed by any person or entity under its control, including its treating

doctors, specialists, nurses, nursing assistants, physician's assistants, employees, servants, and agents at Hunter Holmes McGuire VA Medical Center.

54.    At all times material hereto, the Defendant acted through its employees, staff, agents, officers personnel, and/or contractors and servants, who were acting within the course and scope of their agency and employment with the Defendant, and in furtherance of the Defendant's business.    As such, at all material times, all employees, staff, agents, officers, personnel, and/or contractors at Hunter Holmes McGuire VA Medical Center, were actual or apparent agents, employees and/or servants of the Defendant so that any acts or omissions on the part of the Defendant's employees, staff, agents, officers personnel, and/or contractors and servants are attributable to and imputed to the Defendant pursuant to the doctrines of *respondeat superior* and vicarious liability.

55.    At all times material hereto, Defendant by and through its agents or employees acting within the scope of their employment at Hunter Holmes McGuire VA Medical Center undertook the duty to diagnose, care for, and treat RICHARD DURGIN in accordance with prevailing standards of medical care in the City of Richmond, Virginia or any other similar community.

56.    Notwithstanding said undertaking, Defendant, by and through its agents and/or employees, including but not limited to staff physicians, resident physicians, internists, medical students, nursing personnel and nursing assistants acting within the course and scope of their employment, failed to provide the quality and level of care required by the prevailing standards of care in the City of Richmond, Virginia or any other similar community in one or more of the following ways:

      a.    Negligently failing to provide pressure relief to Richard Durgin, including, but not limited to, using a proper mattress, bedding, and/or protective devices to prevent

13

and treat pressure ulcers;

b. Negligently failing to provide appropriate skin care so as to prevent the development and worsening of pressure ulcers;

c. Negligently providing staff without the necessary training and experience to appropriately assess and provide adequate skin care;

d. Negligently failing to turn and reposition Richard Durgin as required;

e. Negligently failing to provide appropriate wound care;

f. Negligently failing to appreciate the significant changes in the physical condition of Richard Durgin and particularly the condition of his skin;

g. Negligently failing to properly monitor and follow changes in his physical condition;

h. Negligently failing to timely institute treatment for his skin breakdown;

i. Negligently failing to prepare, implement, and update adequate and comprehensive care plans that address the prevention of pressure ulcers and worsening of these pressure ulcers;

j. Negligently failing to properly supervise the healthcare providers who rendered care to Mr. Durgin;

k. Negligently failing to provide treatment which would have provided Mr. Durgin with the best recovery; and

l. Negligently failing to provide the proper interventions thereby failing to timely treat Mr. Durgin's skin breakdown.

57. As a direct and proximate result of the aforementioned acts of negligence by the Defendant, by and through its agents, employees and/or servants acting within the course and scope of their employment, RICHARD DURGIN suffered severe and permanent injuries, pressure ulcers, wounds, skin breakdown, infection, and death. Had appropriate care and treatment been provided to RICHARD DURGIN, his injuries and death would have been prevented.

58. As a direct and proximate result of the aforementioned acts of negligence, RICHARD DURGIN sustained aggravation of preexisting injuries, mental pain and suffering, the cost of medical, nursing, nursing home and hospital care, physical and mental pain and anguish, loss of the capacity for enjoyment of life, disability, disfigurement, until the time of his death on or about October 18, 2011.

## *COUNT I*
## *SURVIVAL CLAIM*

Plaintiff alleges and incorporates by reference Paragraphs 1 through 58 above, as if they were fully set forth herein, and further states:

59.     The Defendant acted through its employees, staff, agents, officers, personnel, and/or contractors and servants, who were acting within the course and scope of their agency and employment with the Defendant, and in furtherance of the Defendant's business. As such, at all material times, all employees, staff, agents, officers, personnel, and/or contractors at Hunter Holmes McGuire VA Medical Center, were actual or apparent agents, employees and/or servants of the Defendant so that any acts or omissions on the part of these employees, agents and/or staff are attributable to and imputed to the Defendant pursuant to the doctrines of *respondeat superior* and vicarious liability.

60.     The Defendant controlled the management and health care decisions made concerning Hunter Holmes McGuire VA Medical Center and exercised control over, and authorized the daily work of its employees at the Hunter Holmes McGuire VA Medical Center.

61.     The individuals providing care to RICHARD DURGIN at Hunter Holmes McGuire VA Medical Center were at all pertinent times herein employees and/or agents of the Defendant and subject to Defendant's supervision, and acting within the scope of their employment or agency. In this capacity, the Defendant authorized and/or subsequently ratified the actions and inactions of the individuals providing care to Mr. Durgin as described in the foregoing paragraphs of this Complaint.

62.     As a result of accepting Mr. Durgin as a patient, the Defendant was under a non-delegable common law duty, as well as the duties prescribed by the standards of care, statutes,

and regulations, to provide Mr. Durgin with the care and services he required as a patient at Hunter Holmes McGuire VA Medical Center.

63.     The Defendant, its employees, and agents breached their duties by engaging in ongoing negligence and systematic failure to provide needed care and services to Mr. Durgin which were or should have been known and yet ignored.

64.     The standards of care required the Defendant to provide these services in a reasonably prudent manner, and, by their acceptance of RICHARD DURGIN as a patient, the Defendant agreed to do so.

65.     The Defendant, through its employees and staff, breached the applicable standard of care in connection with the care and treatment of RICHARD DURGIN. These breaches include, but are not limited to, the following:

   a.   Negligently failing to provide pressure relief to Richard Durgin, including, but not limited to, using a proper mattress, bedding, and/or protective devices to prevent and treat pressure ulcers;
   b.   Negligently failing to provide appropriate skin care so as to prevent the development and worsening of pressure ulcers;
   c.   Negligently providing staff without the necessary training and experience to appropriately assess and provide adequate skin care;
   d.   Negligently failing to turn and reposition Richard Durgin as required;
   e.   Negligently failing to provide appropriate wound care;
   f.   Negligently failing to appreciate the significant changes in the physical condition of Richard Durgin and particularly the condition of his skin;
   g.   Negligently failing to properly monitor and follow changes in his physical condition;
   h.   Negligently failing to timely institute treatment for his skin breakdown;
   i.   Negligently failing to prepare, implement, and update adequate and comprehensive care plans that address the prevention of pressure ulcers and worsening of these pressure ulcers;
   j.   Negligently failing to properly supervise the healthcare providers who rendered care to Mr. Durgin;
   k.   Negligently failing to provide treatment which would have provided Mr. Durgin with the best recovery; and
   l.   Negligently failing to provide the proper interventions thereby failing to timely treat Mr. Durgin's skin breakdown.

66.     But for the Defendant's conduct and breaches of duty, Mr. Durgin would not have suffered the injuries, harms, and death described herein.

67.     Therefore, the Plaintiff claims such survival damages as the jury may seem fair and just including, but not limited to, damages for:

a.     medical expenses;
b.     serious and permanent physical injuries;
c.     physical pain and suffering;
d.     embarrassment;
e.     disfigurement;
f.     mental anguish and psychological injury;
g.     inconvenience; and
h.     other general and special damages, as may be shown at trial.

The injuries and conditions referenced in the above paragraphs required extensive medical care and treatment, and were painful and disfiguring to RICHARD DURGIN.

WHEREFORE, Plaintiff, MARY DURGIN, as Administrator of the Estate of RICHARD DURGIN moves the Court for the following relief against the Defendant as follows:

a.   For judgment in the amount of One Million Dollars ($1,000,000.00) as compensatory damages for the decedent's physical pain and suffering, mental pain and suffering, loss of enjoyment of life, loss of dignity, humiliation, disability, disfigurement, medical expenses and funeral costs, together with prejudgment interest and costs expended;

b.   Any additional relief that this Court deems proper, including reimbursement to MARY DURGIN for her economic loss as a result of the termination and/or reduction of her husband's V.A. and other benefits. She incurred, and is entitled to reimbursement for, medical expenses for the treatment of her husband and his funeral and burial expenses. She is also entitled to damages for the mental anguish and distress she endured, relating to her husband's injuries and death.

c.  Any such other and further relief this Court deems appropriate and just.

## COUNT II-WRONGFUL DEATH

Plaintiff realleges and incorporates paragraphs 1 through 67 above as though fully stated herein, and further states:

68.  As a direct and proximate result of the actions and omissions of the Defendant's employees, nurses and staff at Hunter Holmes McGuire VA Medical Center, their negligent breaches of the standards of care, common law and statutory duties, all as described above, Mr. Durgin was proximately caused to suffer injury which predisposed him to the development of pressure ulcers which ultimately contributed to his death on October 18, 2011.

69.  RICHARD DURGIN is survived by beneficiaries, Mary Durgin, Richard Ellsworth Durgin II, James Edward Durgin, Chris Brian Durgin, Catherine Durgin Shaw, and Jeffrey Scott Durgin, who are, pursuant to Virginia Code §8.01-53, RICHARD DURGIN'S statutory beneficiaries.

WHEREFORE, Plaintiff, MARY DURGIN, as Administrator of the Estate of RICHARD DURGIN claims such wrongful death damages as the jury may seem fair and just including, but not limited to, damages for:

a.  Sorrow, mental anguish, and solace including loss of society, companionship, comfort, guidance, kindly offices, and advice of MR. DURGIN;

b.  Compensation for reasonably expected loss of services, protection, care and assistance provided by MR. DURGIN;

c.  Expenses for the care, treatment and hospitalization of MR. DURGIN incident to the injury resulting in death;

d.  Reasonable funeral expenses.

## ATTORNEYS' FEES AND COST

70.     Plaintiff, MARY DURGIN, individually and as Administrator of the Estate of RICHARD DURGIN,  has retained The Maher Law Firm, P.A. and Rohrstaff Law Firm to represent the Plaintiff, the decedent, and the survivors in this action in accordance with 28 U.S.C.A. § 2678.

71.     Plaintiff, MARY DURGIN, as Administrator of the Estate of RICHARD DURGIN, and the undersigned counsel requests this Court award the Plaintiff 25% of any judgment or gross amount recovered in this cause of action to be paid to the undersigned attorneys by the Defendant and deducted from the award to the Plaintiff plus an award of costs to be taxed against the Defendant.

## JURY DEMAND

Plaintiff demands a trial by jury as to all issues involved herein.


Dated this _10th_ day of October 2014.

                                        MARY DURGIN, as Administrator of the
                                        Estate of RICHARD DURGIN, Deceased,

                                        By Counsel


_____
Sandra M. Rohrstaff, Esquire
VSB#31591
Attorney for Plaintiff Mary Durgin
Rohrstaff Law Firm, P.C.
515 King Street, Suite 330
Alexandria, VA 22314
(703) 260-6070 (TEL)
(703) 260-6305 (FAX)
Sandra@RohrstaffLaw.com

Daniel W. Cotter, Esquire
VSB# 24834
Attorney for Plaintiff Mary Durgin
The Maher Law Firm, PA
631 W. Morse Blvd., Suite 200
Winter Park, FL 32789
(407) 839-0866 (TEL)
(321) 304-6060 (FAX)
DCotter@Cotterlaw.com